Argued September 13, reversed and remanded November 29, 1978

## WILLIAMS, *Respondent,*
### *v.*
## MALLORY, *Appellant.*
### (No. 76-455-E, SC 25460)

587 P2d 85

Gerald R. Pullen, Portland, argued the cause and filed a brief for appellant.

Robert D. Puckett, of Proctor & Puckett, Klamath Falls, argued the cause and filed a brief for respondent.

Before Denecke, Chief Justice, and Tongue, Bryson, and Linde, Justices.

BRYSON, J.

## BRYSON, J.

Plaintiff Chester Williams and defendant Christine Mallory are son and daughter of the deceased, Charlotta C. Williams, who died testate on May 11, 1975. The parties here are co-personal representatives of their mother's estate. Plaintiff brought this declaratory judgment proceeding to determine the interests of the parties in certain assets of the deceased.

The trial court decreed, inter alia,

"1. That the Savings Account No. 38927 with First Federal Savings and Loan Association of Klamath Falls, Oregon, wherein Charlotta C. Williams and Christine W. Mallory were named as joint depositors, is an asset of said estate."

Defendant Christine appeals only from the above portion of the decree. At the time of argument, both parties stated that the case was one in equity and was so tried. We agree and review de novo.

Plaintiff contends the funds in the savings and loan account are an asset of the estate through which he would receive one-half of the savings account under the terms of his mother's will.

Defendant contends the savings and loan account was established by the deceased mother and defendant as a joint tenancy with right of survivorship and not as tenants in common and, therefore, the funds in the account are hers as the survivor.

The deposit agreement was signed by Charlotta C. Williams and Christine W. Mallory on January 2, 1973, and provided:

"Williams, Charlotta C., or
Mallory, Christine W.
* * * * *.

as joint tenants with right of survivorship and not as tenants in common, and not as tenants by the entirety, the undersigned hereby apply for a savings account in

First Federal Savings and Loan Association of Klamath Falls

[ 399 ]

and for the issuance of evidence thereof in their joint names as aforesaid. You are directed to act pursuant to any one or more of the joint tenants' signatures, shown below, in any manner in connection with this account and, without limiting the generality of the foregoing, to pay, without any liability for such payment, to any one or the survivor or survivors at any time. This account may be pledged in whole or in part as security for any loan made by you to one or more of the undersigned. Any such pledge shall not operate to sever or terminate either in whole or in part the joint tenancy estate and relationship reflected in or established by this contract. It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *are and shall be conclusively intended to be a gift and delivery* at any time of such funds to the other signatory party or parties * * *." (Emphasis in original.)

Before considering the facts of this case, it is necessary to discuss the law applicable to rights of survivorship in joint savings accounts.[1] In the landmark case of *Greenwood v. Beeson,* 253 Or 318, 454 P2d 633 (1969), we agreed with the criticism that the law of joint savings accounts did not adequately reflect the intent of those who use the device and decided that we should "cut a new path in this field of the law." 253 Or at 321-22. Under the facts of *Greenwood,* the only issue raised was which party was entitled to the survivorship account while the donee and donor depositor were both living. In *Greenwood* we concluded that ordinarily the donor does not intend the donee to have a *present* beneficial interest in the account, but a similar result is not required with respect to a *survivorship* provision in the account. In other words, in *Greenwood* both signators to the joint account were living at the time of the litigation. In the case at bar, Charlotta C. Williams, deceased, deposited all of the funds to the account but was deceased at the time this litigation was filed.

---

[1]The 1977 legislature enacted ORS 708.616, which governs the disposition of survivorship savings accounts opened after January 1, 1978.

■ We recognized in *Greenwood v. Beeson, supra* at 323-24, that

> "* * * the provision for a right of survivorship would, in most instances, express the intent of the parties. * * * Evidence should be freely admissible to show what the parties intended * * *. * * * [W]hen all of the funds in the account are deposited by only one of the signatories the recitation in the deposit agreement that the account is 'jointly owned' should not be treated as conclusively establishing the intent of the parties * * *."

Therefore, the depository agreement is evidence of the intent of the parties. To the same effect, *see Allen v. Allen,* 275 Or 471, 478, 551 P2d 459 (1976); *Holbrook v. Hendricks' Estate,* 175 Or 159, 168, 152 P2d 573 (1944).

■ In *Greenwood v. Beeson, supra,* we relied heavily on an article by Professor Richard Wellman on the legal problems created by joint savings accounts. Wellman, *The Joint and Survivor Account in Michigan—Progress Through Confusion,* 63 Mich L Rev 629 (1965). Wellman discusses the problem in the present case and stated the following on the issue before us:

> "The opinions reflect the view that people who use joint and survivorship accounts usually intend the survivorship benefits they express. When such an account is intact at the donor depositor's death, the estate of the donor, if unable to show fraud, undue influence, or lack of capacity, will probably not prevail if all it can show is that a reason other than to confer benefits at death attended the opening of the account. Probably it must *also* be shown that it would have been capricious or highly unusual for the decedent to have wanted the death benefits to go to the survivor in light of the decedent's circumstances, the pattern of his family relationships, and the terms of his other testamentary directions." (Emphasis in original.) *Id.* at 645-46.

There is no contention of fraud, undue influence or lack of capacity in the case at bar.

We believe that Professor Wellman's construction is sound and applicable to the facts in the case at bar.

Therefore, we look to the evidence to find the intent of the parties at the time the account was established, and plaintiff has the burden of proving that the money in the joint savings account passed to the estate of Charlotta, as alleged in his complaint.

The evidence discloses that the deceased's husband, and father of the two parties to this proceeding, passed away in 1937, when all of the parties resided in Denver, Colorado. He had accumulated some real property and the deceased, Charlotta, took over and successfully operated their holdings. She was of strong character with an active and good mind for business. The deceased successfully managed the real estate and other assets of her husband and increased the value considerably. Her mind was sound until the time of her death. In 1966 deceased was badly injured and was afraid to live alone. She then moved to Klamath Falls and stayed with her daughter, the defendant. She conducted all of her business in Denver through her attorney of some years, Nathan H. Creamer, whose desposition was received in evidence. In 1972 deceased became upset when her son, plaintiff, was sued for divorce by his second wife, by whom he had three children. The son was preparing to marry a third woman who had three children by a previous marriage. At this time she decided to sell her corporate shares and mutual fund shares and transfer her liquid assets to Oregon. Her real property holdings were retained in Denver.

The best direct evidence of the deceased's intent in establishing the joint savings and loan account with right of survivorship in her daughter was provided by Richard Shuck, an accountant and tax consultant in Klamath Falls. Deceased had first met Mr. Shuck some time in 1960 and came to him for advice in June of 1971, after the divorce of Chester from his second wife. Shuck testified:

"A. She [decedent] says, 'How should I change my will to protect my grandchildren that my son has abandoned.'

"* * * * *.

[ 402 ]

"A. * * * Now, from her daughter, these grandchildren she knew were going to be well taken care of. * * * She told me that her son had abandoned her grandchildren in Denver. She wanted this property protected. * * * 'How should I make my will to protect where this money is going?' I told her, 'You do not have to change your will.' "

Shuck then explained to decedent that she could accomplish the desired result by using a survivorship savings account.

Decedent told Mr. Shuck she would talk the problem over with her lawyer in Denver, Colorado, Mr. Creamer. On January 2, 1973, the decedent opened the joint and survivor savings account with defendant, Christine, as above referred to.

At this approximate time the deceased and her two children had decided to construct a new commercial building on property deceased owned in Denver. The son, plaintiff, refused to sign any papers that would obligate him to repay for the loan necessary for the construction of the new building. The savings account involved here was used as security for a loan that defendant received from the first Federal Savings and Loan Association in Klamath Falls, the proceeds of which were used to pay for the construction of the new building in Denver, but the joint savings account here involved was not used to repay Christine's loan. The record shows that she made the monthly payments from income she received from real estate holdings her mother had given her. The plaintiff brother also received monthly payments from real property given him by his mother but that money was not used to repay the building loan. Mr. Shuck testified directly on this point:

"Q. * * * [W]ere you aware that they were going to or someone was going to be building a building?
"A. Yes.
"Q. Is this talking with whom; do you remember?
"A. Mrs. Williams called me and wanted to know if she should take the money out of the savings and put this in that building.

"Q. What did you advise her?

"A. Absolutely not; unless she wanted that money to go back under the will. Then if she wanted her son to have that money, fine. Otherwise, there is no way that she could take this money out of savings and put it into the partnership because it takes it out of the joint tenancy and would put it into a receivable from the partnership which would come under probate.

"Q. What do you mean, a loan; from her to the partnership?

"A. Yes, the only way I could see that she could protect that money was to leave it in joint tenancy with her daughter if she wanted that money to go to her daughter she had to leave that money in that account.

"Q. Is that what you told her?

"A. Yes.

"Q. And then did you counsel with either her or her daughter further about how to do the building?

"A. * * * I got a hold of Chris [defendant] and told Chris how to go to First Federal, borrow the money, use that account as collateral. Chris borrowed the money and Chris loaned the money to the partnership in Denver, but to leave her mother's money alone, in fact, in that savings account."

The above is the only direct evidence that shows the intent of the decedent. That is, that she intended to make the survivorship provision effective. The trial court made no reference to this evidence in his findings.

Mr. Creamer, deceased's attorney in Denver, was unable to remember any discussion regarding the joint savings account. However, he did testify by deposition as follows:

"A * * * Mrs. Williams [deceased] wanted to be certain that Christine [defendant] had the authority and the direction from her to carry out these obligations and powers without any interference from anybody.

"* * * * *.

"A * * * [S]he wanted Christine to take care of everything because she had great confidence in her and trust in her * * *."

[ 404 ]

Plaintiff and defendant were unable to give any direct testimony as to their mother's intent other than her actions of liquidating assets and depositing them in the joint savings account in Klamath Falls. There seems to be no animosity between plaintiff and defendant. In fact, the plaintiff, when asked about his relationship with his sister and brother-in-law, testified, "Very congenial, no problems." He further testified there was no animosity between the parties in their conversation or letters. Both plaintiff and defendant testified that their mother had a strong personality and acted as she chose. Plaintiff was not living in Klamath Falls and frankly stated he did not know what his mother's intent was in opening the joint savings account. The only testimony on this point in the record by the defendant is as follows:

"Q. Who said what names go on the account at the bank when you people went down, you or your mother? Who determined what names went on that savings account when you went to the bank?

"A. Mother went with me and said that she wanted her name and my name on it."

From the above review of the evidence, we conclude that it was the intent of the deceased to create a joint savings account in the First Federal Savings and Loan Association of Klamath Falls with her daughter, defendant, with a right of survivorship to said funds in the defendant and that said funds are not an asset of her estate.

It follows also that plaintiff is not entitled to attorney fees for bringing funds into the estate.

Plaintiff's brief also raises another issue between the parties about a percentage interest in certain real property; however, plaintiff did not give notice of appeal and filed no cross-appeal.

ORS 19.023 provides:

"(1) An appeal to the Supreme Court or to the Court of Appeals shall be taken in the manner prescribed in ORS 19.023 to 19.065 and 19.074 to 19.190.

"(2) A party to a judgment desiring to appeal therefrom, or some specified part thereof, shall cause a notice, signed by himself or his attorney, to be served on all parties as have appeared in the action, suit or proceeding and file the original, with proof of service indorsed thereon or affixed thereto, with the clerk.

"(3) The notice shall be in the form prescribed in ORS 19.029, shall be filed within the time prescribed in ORS 19.026."

ORS 19.026(3) provides:

"Any other party who has appeared in the action, suit or proceeding, desiring to appeal against the appellant or any other party to the action, suit or proceeding, may serve and file his notice of appeal within 10 days after the expiration of the time allowed by subsections (1) and (2) of this section. Any party not an appellant or respondent, but who becomes an adverse party to a cross appeal, may cross appeal against any party to the appeal by a written statement in his brief."

In *Beard v. Beard,* 232 Or 552, 557, 376 P2d 404 (1962), an equity case, we held that a party who had cross-appealed from a portion of a decree but not other parts of the decree could not, on appeal, challenge that portion of the decree not cross-appealed from and, accordingly, there was no question on the matter before the court.

As pointed out in the beginning of the opinion, the defendant, Christine, appealed only from that portion of the decree involving the savings and loan account.

■ In *Flinn v. Vaughn,* 55 Or 372, 377, 106 P 642 (1910), the court held that even though equity cases are reviewed de novo, parties to the appeal must cross-appeal before they can "insist upon a more favorable decree than that awarded them by the trial court * * *."[2] It follows that the plaintiff, having

---

[2]In *Artman v. Ray,* 263 Or 529, 501 P2d 63 (1972), an action for conversion, we held that the prevailing party seeking to *sustain the judgment* should not be required to cross-appeal from the judgment in order to preserve for this court's consideration on review certain alleged errors by

failed to give notice of appeal or to cross-appeal, cannot raise other objections to the trial court's decree.

Reversed and remanded for entry of a decree not inconsistent herewith. No costs to either party.

the trial court. We further held that even though no cross-appeal is necessary, it is essential that the prevailing party unequivocally make the alleged error and issue on appeal. *See also Bakker v. Baza'r, Inc.,* 275 Or 245, 248 n 2, 551 P2d 1269 (1976).

In *Dean Vincent, Inc. v. Stearns,* 276 Or 533, 537, 555 P2d 448 (1976), we held that a cross-appeal is unnecessary where the respondent does not contend that the judgment is erroneous.